# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 1, 2025        Decided July 21, 2026

No. 22-3035

UNITED STATES OF AMERICA,
APPELLEE

v.

BRITTANY JONES,
APPELLANT

Consolidated with 23-3033, 23-3038

Appeals from the United States District Court
for the District of Columbia
(No. 1:19-cr-00307)

*Antoini M. Jones* argued the cause and filed the brief for appellant Brittany Jones.

*Courtney L. Millian*, Assistant Federal Public Defender, argued the cause for appellant Willis P. Lewis. With her on the briefs was *A. J. Kramer*. *Tony Axam Jr.*, Assistant Federal Public Defender, entered an appearance.

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth A. Hutson*, Trial Attorney, U.S. Department of Justice, *Jeanine Ferris Pirro*, U.S. Attorney, and *Chrisellen R. Kolb*, Assistant U.S. Attorney.

Before: SRINIVASAN, *Chief Judge*, MILLETT and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

PAN, *Circuit Judge*: For about three weeks in the spring of 2019, Willis Pierre Lewis and Brittany Jones sex trafficked two underage girls — ZS and THY. Lewis took a percentage of the money that the girls earned from "dates" with dozens of clients. He also controlled the girls' movement, finances, and activities, and even had them sign "loyalty contracts." Jones brought ZS and THY into Lewis's orbit and facilitated the trafficking by posting photos of the girls in "stripper outfits" and driving them to meet a potential client.

Following a two-week trial, a jury convicted Lewis and Jones of multiple offenses. The district court sentenced Lewis to life imprisonment and Jones to 168 months' imprisonment. On appeal, Lewis and Jones raise a medley of issues: Both claim to have been prejudiced by a variance between the single conspiracy charged in the indictment and the evidence of "multiple conspiracies" that they claim was presented at trial; Lewis challenges three of the district court's evidentiary rulings, one of its jury instructions, and several of its actions at sentencing; and Jones contends that her trial counsel was constitutionally ineffective. For the reasons explained below, we affirm Lewis's and Jones's convictions, vacate Lewis's sentence, and remand for resentencing of Lewis.

## I. Factual Background

In April 2019, fifteen-year-old ZS and seventeen-year-old THY ran away from a residential facility for at-risk minors in Virginia. They made their way to Washington, D.C., where they met a man named Curtis Fowler. Fowler told ZS and THY that they could make money by engaging in commercial sex and could advertise their services on a website called MegaPersonals. He let them use his phone to take photos of themselves, which they posted on MegaPersonals, but they failed to secure any "dates" — *i.e.*, commercial sex encounters.

Appellant Brittany Jones then entered the story. Fowler called Jones "because [he] knew [that she] was throwing [stripper] parties" and thought that she could help ZS and THY earn money. J.A. 899. Jones agreed to help Fowler for a twenty-percent fee. Jones drove Fowler, ZS, and THY to the house of Fowler's girlfriend, Dyamond Smith. Jones gave the girls "stripper outfits" to wear and "started taking pictures" of them, which were posted on MegaPersonals. J.A. 903–04. But the postings again received no responses.

The next day, Jones called appellant Willis Pierre Lewis and his employee, Ashley Taylor. Taylor's job was to "recruit[] females [for prostitution], post[] the females [online], get[] the payment[s] from the females, [and] deal[] directly with the females," all on Lewis's behalf. J.A. 1335–36. Jones explained to Lewis and Taylor "that she had some female[s] . . . that were trying to work" — *i.e.*, engage in "[c]ommercial sex." J.A. 1344. At Lewis's direction, Taylor and Jones brought ZS and THY to Lewis's house.

When they arrived, Lewis told Taylor to prepare ZS and THY "to make some money" and to get them to sign "loyalty contracts." J.A. 1357–58, 1360. Taylor accordingly instructed the girls to connect to Lewis's Wi-Fi and to post advertisements

on MegaPersonals. When Taylor asked the girls their ages, they responded that they were "18 and 19, or 18 and 20." J.A. 1358. Later, they both signed the "loyalty contracts." *Id.*

When ZS subsequently secured a "date," Jones drove the girls to meet the client, acting at Lewis's direction. But the "date" eventually fell through and, upon the group's return, Lewis got angry at Jones. In the presence of Taylor and the girls, he "grab[bed]" Jones and threatened "to shoot the whole shit up." J.A. 1367. Taylor told Jones to leave because, "I don't want neither one of us to be dead." *Id.* Jones then departed.

Lewis, Taylor, ZS, and THY went to a motel and posted new MegaPersonals ads. ZS and THY soon began securing clients, with Lewis setting the rates for the girls' services, controlling their movements, and housing them in motels. He also took a cut of their earnings. Over the course of about a week, ZS and THY engaged in several dozen commercial sex encounters at the motels.

When Lewis could no longer extend their motel stay, he and Taylor contacted Roderick Barton, a man who "knew about some places that hosted parties for commercial sex dates." J.A. 1435. Lewis, Taylor, ZS, and THY went to Barton's house, where Lewis and Barton discussed making a pornographic video with ZS and THY, posting it online, and "divid[ing] whatever the income was." J.A. 1438. Taylor later recorded a video of THY and Barton having sex. During their stay at Barton's house, ZS and THY collectively engaged in around seven commercial sex encounters, including one to which Lewis drove ZS.

THY eventually decided to return home, which angered Lewis. He asked ZS to try to convince THY to stay, but THY

refused. Lewis allowed THY to leave with the money she had earned, minus his share.

ZS remained with Lewis at a new motel for "a little less than a week," during which she averaged between eight and twelve commercial sex encounters per day. J.A. 1461. As with many of her prior "date[s]," ZS would "giv[e] up a portion [of her earnings] to Mr. Lewis and keep[] a portion to herself." J.A. 1462–63. Ultimately, ZS also decided to leave Lewis. Taylor soon followed suit.

## II. Procedural Background

Based on a tip from the National Center for Missing and Exploited Children, the Federal Bureau of Investigation (FBI) tracked down ZS and THY. The girls told the FBI about how they had been sex trafficked, and they identified the perpetrators as Lewis, Taylor, Fowler, Barton, Jones, Ronda Manns (Lewis's wife), and Smith (Fowler's girlfriend).

In October 2019, a grand jury returned a fifteen-count superseding indictment against Lewis, Jones, Smith, and Manns.[1] It charged all four defendants with conspiracy to sex traffic minors, in violation of 18 U.S.C. § 1594(c) (count five), and it charged Lewis, Jones, and Manns with interstate travel and transportation in aid of racketeering, in violation of 18 U.S.C. § 1952(a)(3)(A) (count eleven). It also charged Lewis and Jones with sex trafficking of minors, in violation of 18 U.S.C. § 1591(a)(l), (a)(2) & (b)(2) (counts three and four); transportation of minors with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a) (counts six and seven); conspiracy to transport minors with intent to engage in criminal sexual activity, in violation of 18 U.S.C.

---

[1] The government pursued separate prosecutions against Fowler, Taylor, and Barton.

§ 2423(e) (count eight); and transportation of individuals to engage in criminal sexual activity, in violation of 18 U.S.C. § 2421(a) (counts nine and ten). Additionally, the indictment charged Lewis individually with sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a)(1), (a)(2) & (b)(1) (counts one and two); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (count twelve); obstruction of enforcement of a sex-trafficking law, in violation of 18 U.S.C. § 1591(d) (count thirteen); and assault, in violation of D.C. Code § 22-404(a)(l) (count fifteen). Finally, the indictment charged Manns alone with obstruction of enforcement of a sex-trafficking law, in violation of 18 U.S.C. § 1591(d) (count fourteen).

Prior to trial, Smith and Manns entered plea agreements with the government, which required them to testify at trial. The trial court also agreed to sever count fifteen — the D.C. assault charge against Lewis — from his federal charges. Lewis and Jones thus proceeded to a joint trial on counts one through thirteen of the indictment.

At the close of trial, the jury found Lewis guilty on counts one through twelve and not guilty on count thirteen (obstruction of enforcement). The jury found Jones guilty on counts three and four (sex trafficking), five (conspiracy), and eleven (interstate travel in aid of racketeering), and not guilty on counts six through ten (involving transportation related to sex trafficking). The district court sentenced Lewis to life imprisonment and Jones to 168 months in prison.

Lewis and Jones filed timely appeals. We have jurisdiction under 28 U.S.C. §§ 1291, 3742(a).

### III. Analysis

### A. Variance

Lewis and Jones argue that the trial evidence did not support the conspiracy alleged in their indictment. Specifically, while the indictment charged them and others with participating in a single conspiracy to traffic ZS and THY, they contend that the trial evidence revealed two separate conspiracies, and that this alleged variance warrants reversal. We disagree.

To demonstrate a prejudicial variance, Lewis and Jones "bear[] the burden of showing (1) that the evidence established the existence of multiple conspiracies, rather than the one conspiracy alleged in the indictment, and (2) that because of the multiplicity of defendants and conspiracies, the jury was substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *United States v. Eiland*, 738 F.3d 338, 358 (D.C. Cir. 2013) (cleaned up). We must uphold Lewis's and Jones's convictions either "if the evidence adequately supports the jury's finding that a single conspiracy existed," or if it is not "substantially likely" that they were convicted based on evidence transferred from a conspiracy that they did not join. *Id.* at 358–59 (citation omitted).

"In distinguishing a single conspiracy from multiple conspiracies, we ask whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 207 (D.C. Cir. 2013) (cleaned up). Co-defendants may be involved in different aspects of a conspiracy, and "there is no requirement that each conspirator know the identity of every other conspirator." *United States v. Jenkins*, 928 F.2d 1175, 1178 (D.C. Cir. 1991).

Lewis and Jones contend that the trial evidence depicted multiple conspiracies with non-overlapping members. They claim that the first conspiracy included Jones, Fowler, and Smith, whom they group together based on those three conspirators' initial unsuccessful attempts to traffic ZS and THY. The second asserted conspiracy comprised Lewis, Taylor, and Barton, who allegedly bore sole responsibility for the sex trafficking that followed the girls' arrival at Lewis's house. Notably, Lewis and Jones contend that they did not conspire with one another, and instead that each of them participated in a different conspiracy. They argue that they were prejudiced because evidence of the separate conspiracies may have become intermingled during their joint trial.

We disagree. The trial evidence supported the existence of a single conspiracy to traffic ZS and THY in dozens of commercial sex encounters, perpetrated by conspirators including at least Lewis, Jones, and Taylor. Contrary to Jones's claim that she did not conspire with Lewis, the evidence showed that Jones furthered the trafficking scheme by introducing and transporting the girls to Lewis and Taylor. She concedes that she spoke with Lewis and Taylor "about the [prospect of the] girls working" for them and "br[ought] the girls" to Lewis's home. Jones Br. 22. She later drove the girls — at Lewis's behest — to and from an (unsuccessful) commercial sex "date." Jones thus "shared a common goal" with the other conspirators — *i.e.*, the trafficking of the two girls — and she was directly "involved" with Lewis and Taylor in "carrying out at least some parts of the plan." *Lopesierra-Gutierrez*, 708 F.3d at 207.

It is true that, following the unsuccessful "date" (and Lewis's irate threats), Jones did not take any further action in support of the conspiracy, and that Lewis and Taylor thereafter sex trafficked ZS and THY more extensively. But even if Jones

was not directly involved in the later trafficking, her mere inactivity at that stage did not erase or diminish her role in the conspiracy to traffic ZS and THY. *See Smith v. United States*, 568 U.S. 106, 114 (2013) ("[A] defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it." (emphasis in original)); *id.* at 113 ("To avert a continuing criminality there must be affirmative action to disavow or defeat the purpose of the conspiracy." (cleaned up)). Nor does Jones argue that she successfully withdrew from the conspiracy. *See Hyde v. United States*, 225 U.S. 347, 369–70 (1912) ("As he has started evil forces, he must withdraw his support from them or incur the guilt of their continuance.").

Because Lewis and Jones were convicted for their roles in the single conspiracy charged in the indictment, and there is no showing at all that evidence from another conspiracy tainted their trial, we reject their claim of a prejudicial variance. *See Eiland*, 738 F.3d at 358–59.

## B. Evidentiary Rulings

Lewis next objects to the district court's admission of two allegedly prejudicial testimonial statements, as well as its exclusion of certain impeachment evidence. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Barrow*, 109 F.4th 521, 530 (D.C. Cir. 2024).

### 1. Testimony

Lewis argues that the district court erroneously admitted two prejudicial statements that were elicited from government witnesses over his objection. First, on direct examination of Manns (Lewis's wife), the prosecutor asked whether Manns "ever s[aw] Mr. Lewis with a gun." J.A. 1944. Manns replied, "Yeah. One time he was in the house cleaning it and then one

time when he pulled it on me" and held it "up to my head." J.A. 1945–47. Second, the prosecutor asked Fowler whether Lewis had said anything to Fowler "about being in a gang." J.A. 1049. Fowler responded that Lewis "said he was a Crip . . . [a]ll his life," explaining that Lewis "was a gangbanger . . . [f]or some years." J.A. 1049–50.

Lewis contends that the statements in question should have been excluded under Federal Rule of Evidence 403 because their probative value was "substantially outweighed by a danger of unfair prejudice." Lewis Br. 27 (cleaned up). As to Manns's testimony, Lewis argues that "[d]omestic violence is a quintessential example of unfairly prejudicial evidence." *Id.* at 30. And he points out that Manns's testimony carried minimal probative value because it concerned conduct entirely removed from Lewis's trafficking of ZS and THY. As to Fowler's testimony, Lewis asserts that "[g]uilt by association is a genuine concern whenever gang evidence is admitted." *Id.* at 33 (quoting *United States v. Irvin*, 87 F.3d 860, 865 (7th Cir. 1996)). And again, Lewis highlights the minimal probative value of Fowler's testimony given that the government did not draw any connection between Lewis's gang affiliation and his trafficking of ZS and THY.

Even if we assume that the statements at issue were unduly prejudicial, any error was harmless because the statements did not have a "substantial and injurious effect on the jury's verdict." *United States v. McGill*, 815 F.3d 846, 880 (D.C. Cir. 2016) (citation omitted). Where the "testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury," the error is harmless. *Brown v. United States*, 411 U.S. 223, 231 (1973); *see also United States v. Watson*, 717 F.3d 196, 199 (D.C. Cir. 2013) (holding that wrongly admitted evidence

generally "cause[s] no prejudice" where it is "cumulative of . . . properly admitted" evidence).

Manns's testimony that Lewis had a gun and once held it to her head was harmless when viewed in the context of the extensive trial evidence — the admission of which Lewis does not challenge — of Lewis's threatening statements toward his coconspirators and his use of firearms. For example, Manns testified that when she defied Lewis, he would "go off" on her, meaning that he would "probably want to fight [her]." J.A. 1961–62. And Taylor testified that Lewis "[p]ut his hands around [her] neck" and "choked" her "in front of" ZS and THY, while saying "I'm going to fuck you up, stupid bitch." J.A. 1479–80. Taylor also testified that after she accidentally left Lewis's phone in his friend's car, Lewis "backhand[ed]" her — again in ZS and THY's presence — and said, "I told you to be more careful about my shit. If you keep fucking up, I'm going to kill you." J.A. 1481–82. Further, ZS testified that Lewis frequently kept a gun on him; Fowler testified that Lewis once hid his "gun under one of the girl's pillow[s]," J.A. 919; and Taylor testified that Lewis threatened to "shoot the whole shit up" when he was angry, J.A. 1367. Manns's testimony about Lewis's violence and his use of a gun was "merely cumulative" of this other evidence, which Lewis does not challenge. *See Brown*, 411 U.S. at 231.

Moreover, insofar as the testimony could have caused the jury to infer that Lewis used force, fraud, or coercion to traffic ZS and THY — an element of counts one and two — the prosecution presented abundant, direct evidence to prove that element. Lewis regularly employed force and coercion in the girls' presence, by assaulting, threatening, and intimidating Taylor and Jones. He also had the girls sign "loyalty contracts," J.A. 1358; carried a gun when he was with the girls; and stringently controlled the girls' movement, finances, and

activities. *See* 18 U.S.C. § 1591(e)(2), (5) (defining "coercion" to include threats of "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm[] that is sufficiently serious"); J.A. 2397–98 (instructing the jury that it may rely on "non-physical types of harm"). "Taken together, all of that properly admitted evidence rendered harmless the [allegedly] mistaken admission" of Manns's testimony about Lewis's possession and use of a gun. *United States v. Sheffield*, 832 F.3d 296, 309 (D.C. Cir. 2016).

The admission of Fowler's gang-related testimony was likewise harmless. It consisted of a single, short exchange that played a *de minimis* role in the trial. *See United States v. Powell*, 334 F.3d 42, 46–47 (D.C. Cir. 2003). The government did not invoke Lewis's gang membership in its closing or on rebuttal. In any event, to the extent that Fowler's testimony about Lewis's Crips membership might have caused the jury to infer that Lewis was violent or guilty by association, the evidence presented at trial — including the evidence of Lewis's actual violence toward Manns, Jones, and Taylor — overwhelmingly established Lewis's guilt.[2] *See Brown*, 411 U.S. at 231.

### 2. Impeachment Evidence

Lewis argues that the district court erroneously precluded his counsel from using certain recordings of jailhouse calls to impeach two of the government's witnesses: Manns and David Snyder (Lewis's cellmate). Although the government now concedes that the district court erred, we reject Lewis's claim.

---

[2]    Insofar as Lewis also objects to the admission of vaguer gang-related testimony from Manns, the admission of that testimony was harmless for similar reasons.

At numerous points during the trial, Lewis's counsel sought to impeach various government witnesses by playing recordings of jailhouse calls in which the witnesses made inconsistent statements. The government complained on several occasions that defense counsel had not previously disclosed the recordings to the government. The court then directed defense counsel to disclose any other recordings prior to playing them.

On the night before Manns and Snyder were scheduled to testify, Lewis's counsel provided the government with "three to four hours" of recordings of their jailhouse calls. J.A. 329. The government filed a motion *in limine* to exclude the recordings, arguing that the disclosure was untimely. The government asserted that, given the recordings' length, the prosecution lacked "the opportunity for any meaningful review." *Id.* And it contended that Lewis should have produced the calls earlier as reciprocal discovery under Federal Rule of Criminal Procedure 16(b). Lewis countered that Rule 16(b) "does not cover impeachment evidence[,] and [the recordings here are] purely impeachment evidence." J.A. 1870. The district court granted the government's motion and precluded the defense from using the calls.

On appeal, Lewis argues — and the government concedes — that the district court erred. Rule 16(b) obligates a criminal defendant to provide reciprocal discovery for certain evidence that "the defendant intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A)(ii). As the government now admits, Rule 16(b) does "not apply to impeachment evidence." Gov't Br. 23 (quoting *United States v. Eason*, 829 F.3d 633, 638 (8th Cir. 2016)); *see also United States v. Gray-Burriss*, 791 F.3d 50, 57 & n.2 (D.C. Cir. 2015) (similar, and collecting analogous cases from other courts of appeals). Because Lewis sought to

introduce the jailhouse calls "purely [as] impeachment evidence," the district court should not have excluded them. J.A. 1870.

We nevertheless reject Lewis's claim. We are constrained to do so because the contents of the calls are not in the record, and we therefore are unable to assess the "importance" of that evidence. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Lewis was responsible for creating a record to support his claim on appeal and to enable this court to assess the prejudicial effect of the exclusion. *See* Fed. R. Evid. 103(a) ("A party may claim error in a ruling to . . . exclude evidence only if . . . [the] party informs the court of [the evidence's] substance by an offer of proof, unless the substance was apparent from the context."); *cf. United States v. Thompson*, 279 F.3d 1043, 1048 (D.C. Cir. 2002) ("Because Thompson did not proffer his intended response or otherwise inform the court of the nature of the evidence sought to be adduced . . . , we are substantially hindered in reaching the conclusion that the district court erred."). But Lewis failed to inform the district court "of [the calls'] substance" — he made no "offer of proof" and did not make the recordings a part of the record. Fed. R. Evid. 103(a)(2). Nor is the evidence's "substance . . . apparent from the context." *Id.* Because Lewis gives us no way to assess the importance of the calls to his case, he may not claim prejudicial error in the district court's ruling.

## C. Jury Instruction

Lewis argues for the first time on appeal that the district court gave an erroneous jury instruction when defining the necessary criminal intent for the charges of sex trafficking by force, fraud, or coercion (counts one and two). We review unpreserved objections to a trial court's jury instructions for

plain error. *United States v. Bostick*, 791 F.3d 127, 143 (D.C. Cir. 2015).

To be convicted of sex trafficking by force, fraud, or coercion, a defendant must have recruited a person "knowing," or "in reckless disregard of the fact," that "force, threats of force, fraud, [or] coercion . . . [would] be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2). The government proposed to the district court a reckless-disregard definition from Judge Leonard Sand's *Modern Federal Jury Instructions (Criminal)*: "'Reckless disregard' of a fact means deliberate indifference to the fact which, if considered in a reasonable manner, indicates that there was a high probability of the fact at issue." J.A. 305, 307. Lewis did not object, and the district court provided that definition to the jury.

Lewis now argues that the district court's jury instruction defining "reckless disregard" erroneously reduced the conviction standard to "criminal negligence." Lewis Br. 44 (emphasis omitted). We reject his argument because he has not met the standard for demonstrating reversible plain error. *See Bostick*, 791 F.3d at 143–44. Under the plain-error standard, Lewis must show "(1) that there was an error, (2) that the error was clear or obvious, (3) that it affected the appellant's substantial rights, and (4) that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (citation omitted). If Lewis satisfies those factors, then, "in the exercise of a sound discretion, [we] may notice forfeited error." *United States v. Olano*, 507 U.S. 725, 735–36 (1993) (cleaned up).

Regardless of whether Lewis has satisfied the first two prongs of the plain-error test — *i.e.*, that the district court erred in a clear or obvious way — he fails to meet his burden to show

that the asserted error affected his "substantial rights" and "seriously affected the fairness, integrity, or public reputation" of the proceedings. A defendant's substantial rights are "affected if the error was prejudicial and actually affected the outcome below." *Bostick*, 791 F.3d at 149 (cleaned up).

Here, the alleged error in defining "reckless disregard" was not prejudicial because the jury could not possibly have convicted Lewis on a "reckless disregard" theory, and the definition therefore could not have affected the outcome of the trial. Lewis was the perpetrator of the force, threats, and coercion used in the trafficking scheme — thus, he knew about and could not have "recklessly disregarded" such conduct. At bottom, the jury reasonably rejected his defense that he thought the girls were "being voluntarily trafficked." Lewis Br. 46. It was Lewis who had the girls sign "loyalty contracts," J.A. 1358; controlled the girls' movement, finances, and activities; carried a gun in the girls' presence; and exposed the girls to the assaultive and threatening behavior that he directed at Taylor and Jones. Because Lewis himself created the coercive conditions at issue, he did not merely "recklessly disregard" the use of force, threats, or coercion under any definition of that term. The jury instruction defining "reckless disregard" therefore had no bearing on Lewis's convictions. For that reason, the asserted error also could not have "seriously affected the fairness, integrity, or public reputation" of the proceedings. *Bostick*, 791 F.3d at 144 (citation omitted). In short, Lewis's claim fails the plain-error test.

**D. Lewis's Sentence**

Lewis challenges his life sentence. He contends that the district court erred in applying three enhancements to his offense level when calculating his Guidelines range, and that the court failed to adequately explain his sentence. We agree

that the district court did not make the factual findings necessary to support the application of the Guidelines enhancements and did not sufficiently explain its reasons for imposing a life sentence. We therefore vacate the sentence and remand for resentencing.

*1. Sentencing Proceedings*

After Lewis's conviction, his probation officer prepared a presentence report calculating his sentencing Guidelines range as life imprisonment. The probation officer's calculation relied on several enhancements to Lewis's offense level, including (1) two points for using a computer to "facilitate the travel of a minor to engage in prohibited sexual conduct" or to "solicit a person to engage in prohibited sexual conduct with a minor," under U.S.S.G. § 2G1.3(b)(3); (2) two points because the victims were "vulnerable victim[s]," under § 3A1.1(b)(1); and (3) four points because Lewis "was a leader of [a] sex trafficking conspiracy that involved five or more participants," under § 3B1.1(a). S.A. 15–17; *see also* Lewis Br. 21–22 (noting the same).

Lewis's counsel filed written objections to those three enhancements, among others, and repeated his objections at the sentencing hearing. The district court rejected Lewis's arguments in general terms and did not address the specific claims that counsel had made. The court found "that the total offense level of 43, as stated in the report, is correct," and it thus adopted a Guidelines range of life imprisonment. J.A. 2495.

The district court then heard the parties' sentencing allocutions. Lewis's counsel advanced "various arguments for [a downward] variance," including Lewis's "difficult background; his role in the offense; . . . his lack of assaultive behavior to the complainants, either physical or sexual; his

particular role in this case; . . . his health condition; [and] his efforts to rehabilitate while incarcerated." J.A. 2521–22.

Following the allocutions, the district court announced a sentence of life imprisonment, consistent with the Guidelines range. *See* U.S.S.G. ch. 5, pt. A (Sentencing Table). The court then asked whether either party objected to the sentence. Lewis's counsel responded in the affirmative and advanced "a general objection" that the court "did not consider" the mitigating circumstances that he had argued. J.A. 2521. He also repeated his objections to the district court's application of several enhancements to Lewis's offense level, and he made "a generalized objection to the lack of findings that the Court has not made." J.A. 2522.

The court responded:

> Well, I should say, you know, I read carefully the presentence report. I sat through the trial. So I know a lot about the circumstances. I would say, in addition, that the victim impact statement and the victim's testimony weighed heavily on me. And I understand that the guidelines are severe in this case, and they weigh heavily on me. . . .

> This is a difficult case. I have — I have some understanding of the defendant's situation. I have to feel for the defendant's family. They're sitting right there. I have to have some empathy for the defendant and for the defendant's family and the posture he is in.

> But I also have to have some understanding about the victims here and what they've gone through. And I've got two young girls that I

think will never get over this. I know one testified. And I know she will never be the same. And I — the impact of what she said to me today has to weigh heavily on the Court.

So that's the best I can do to explain why I did what I did. And I hope that will help the family understand why I did what I did as well.

J.A. 2522–24. Based on that reasoning, as well as its general inclination to follow the Guidelines, the district court rejected Lewis's objections. It then ended the hearing.

### 2. Lewis's Appeal

On appeal, Lewis challenges as procedurally unreasonable the district court's application of the two-point computer enhancement, the two-point vulnerable-victim enhancement, and the four-point leadership enhancement when calculating his Guidelines range, as well as the district court's failure to address the mitigating factors that he raised to justify a downward variance. We agree that the procedures followed by the district court were insufficient and therefore vacate Lewis's sentence and remand for resentencing.

In considering Lewis's sentencing claims, "we review purely legal questions *de novo*, review factual findings for clear error, and give due deference to the district court's application of the Guidelines to the facts." *United States v. Calloway*, 94 F.4th 130, 134 (D.C. Cir. 2024) (citation omitted).

As a procedural matter, once a district court selects a sentence, it must "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). "The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments

and has a reasoned basis for exercising his own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). While a within-Guidelines sentence generally does not "require lengthy explanation," if a defendant "argues for departure," the judge must "go further and explain why he has rejected those arguments." *Id.* at 356–57. At bottom, a district court "must make an individualized assessment based on the facts presented," and, "after settling on the appropriate sentence, [it] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *United States v. Brinson-Scott*, 714 F.3d 616, 625 (D.C. Cir. 2013) (cleaned up).

Here, the district court neglected to specifically address Lewis's arguments for a downward variance. Lewis raised several mitigating circumstances, which he claimed justified a variance from the Guidelines sentence of life imprisonment. In response, the court emphasized its familiarity with the case, its sympathy for the victims, and its fidelity to the Guidelines. The district court did not discuss the asserted mitigating factors, nor provide any basis for us to infer that it actually considered those arguments. *See, e.g.*, *United States v. Iracks*, 106 F.4th 61, 69 (D.C. Cir. 2024); *United States v. Knight*, 824 F.3d 1105, 1110 (D.C. Cir. 2016); *United States v. Simpson*, 430 F.3d 1177, 1186–87 (D.C. Cir. 2005).

In addition, when determining the Guidelines range, the district court should have more fully explained its application of the three offense-level enhancements that Lewis challenges on appeal. "We have long required the district court to explain clearly the factual basis on which it relies in applying an enhancement to a defendant's base offense level." *United States v. Hart*, 324 F.3d 740, 748 (D.C. Cir. 2003). Here, the district court did not make the necessary factual findings to support the three enhancements, including why ZS and THY

qualified as vulnerable victims and why Lewis's criminal activity "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). And as to the computer enhancement, the government concedes that "a remand may be appropriate" because "the record does not reveal the district court's precise [factual] findings." Gov't Br. 55–56. Without the required findings, we lack "detail sufficient to allow [us] to conduct [our] review." *Hart*, 324 F.3d at 749 (citation omitted).

We therefore vacate Lewis's sentence and remand for resentencing.

### E. Ineffective Assistance of Counsel

Finally, Jones makes a claim of ineffective assistance of counsel. She contends that her trial counsel was constitutionally ineffective because (1) he did not challenge the reliability of cellphone-tracking data that the government introduced; and (2) he failed to object to the introduction of certain text messages. Both of her arguments lack merit.

To "succeed on a Sixth Amendment claim of ineffective assistance of counsel, a defendant must show two things: (1) 'that counsel's performance was deficient,' and (2) 'that the deficient performance prejudiced the defense.'" *United States v. Shabban*, 612 F.3d 693, 697 (D.C. Cir. 2010) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish deficiency, she must show that her "counsel's representation fell below an objective standard of reasonableness." *Porter v. McCollum*, 558 U.S. 30, 38 (2009) (per curiam) (citation omitted). In evaluating deficiency, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Meanwhile, to establish prejudice, Jones "must show that there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different." *Porter*, 558 U.S. at 38–39 (citation omitted).

Jones first asserts that her trial counsel performed ineffectively by failing to challenge the reliability of cellphone-tracking data that the government introduced. According to Jones, the use of cell-site-location information to approximate the location of a cellphone "has been a questioned science for many years," and her counsel thus should have investigated its "accuracy or reliability" by, for example, locating an "expert that would challenge the testimony presented by the Government." Jones Br. 29–30. Jones also notes that her attorney did not cross-examine the government witness — Special Agent Matthew Wilde — who presented the cell-site-location data.

The decision not to fight the government's use of cellphone-tracking technology was neither deficient nor prejudicial. Cell-site-location data "enjoys widespread use by law enforcement," and "[c]ourts have generally found [it] to be reliable and admissible." *United States v. Morgan*, 45 F.4th 192, 202 (D.C. Cir. 2022). While such data is not perfectly accurate, Agent Wilde explained its limitations: He testified that cell-site data only reveals a phone's "general location" and does not provide a "specific pinpoint location." J.A. 1794, 1800. And he acknowledged that "urban environment[s]" and physical obstructions can interfere with the technology. J.A. 1798. Moreover, Jones's precise locations did not form any part of her defense. *Cf. United States v. Mohammed*, 863 F.3d 885, 891 (D.C. Cir. 2017) (considering it "[n]otabl[e]" for ineffectiveness purposes that trial counsel had "some important clues" and "was aware" that the "crucial" testimony at issue "would be central" to the trial, yet failed to investigate). And the record contained abundant alternative evidence

establishing Jones's whereabouts, meaning that Jones has not shown a "reasonable probability" that the challenged data altered the outcome of her trial. *Porter*, 558 U.S. at 38–39 (citation omitted). Under the circumstances, Jones's counsel did not perform ineffectively by deciding to forgo probing the accuracy of a generally reliable technology. *See United States v. Islam*, 932 F.3d 957, 964 (D.C. Cir. 2019).

Second, Jones argues that her trial counsel rendered ineffective assistance by not objecting to the introduction of certain text messages. The text exchange in question occurred on April 21, 2019 — around three days before Jones met ZS and THY. In the texts, Jones discussed an upcoming "adult" commercial sex party, where Jones would "take 30 percent for hosting." J.A. 754. Jones argues that the government improperly introduced those messages to show that she had a propensity to engage in commercial sex trafficking.

Even if we assume that Jones's trial counsel should have objected, Jones was not prejudiced by the asserted error. The wrongful admission of evidence generally "cause[s] no prejudice" where the evidence is "cumulative of . . . properly admitted" evidence. *Watson*, 717 F.3d at 199. Here, the district court admitted very similar evidence that Jones does not challenge — namely, a series of April 22 text messages between Jones and Barton about an upcoming commercial sex party where they would "take 30 percent" of the profits. J.A. 792. There is no reasonable probability that the proceeding would have turned out differently if her counsel had objected to the interchangeable messages from April 21.

\* \* \*

For the foregoing reasons, we affirm the convictions of Willis Pierre Lewis and Brittany Jones, vacate Lewis's

sentence as procedurally unreasonable, and remand for the district court to resentence Lewis.

*So ordered.*